Case No. 14-1154, et al. National Association of Broadcasters Petitioner v. Federal Communications Commission, et al. Mr. Estrada, for Petitioner, National Association of Broadcasters. Mr. Hain, for Petitioner, Sinclair Broadcast Group, Inc. Mr. Lewis, for the Respondent. And Mr. Perella, for the Intervenors. Mr. Hain, for the Intervenors. All right. Good morning, Mr. Estrada. Thank you, Judge Henderson, and may it please the Court, Miguel Estrada for NAD. Congress expressly designed a voluntary auction process that assures broadcasters that those who remain on the back end and will be repacked will retain their coverage area and population served as determined using a particular methodology and as of a specific date in 2012. What the Commission has done in this order is to turn the voluntary process into a coercive process designed to tell you now that on the back end you will have much less than you had in 2012, both in order to stampede bids into the auction and in order to have more spectrum on the back end, supposedly to serve the higher ends of the Spectrum Act. That is the practical consequence of what's going on. There are many legal errors, including those of interpretation of the Spectrum Act and massive procedural failings under the APA, because a lot of what we're complaining about was never part of the notice of proposed rulemaking. The Commission actually doesn't dispute that this was in the notice of proposed rulemaking. Now, let's tackle some of the issues under the Spectrum Act. As of the date that Congress picked, there was only one way to determine what the coverage area and population served was. There was an OAT-69, and it was used primarily, if not exclusively, for one purpose. You filed an application for a license under the rules, and under the regulation you applied the OAT-69 bulletin as it exists today and then. It has not been changed in this rulemaking. Can I ask you a question on this part of the case? If the statute said the following instead of what it actually says, suppose the statute starts out the relevant provision, which is 1452b2, I think. If it starts out by saying, in making any reassignments or reallocations under paragraph 1b, etc., etc., the Commission shall make all reasonable efforts to preserve, as of February 22, 2012, the coverage area and population served of each broadcast television licensee, period. And then it says, for purposes of determining the coverage area and population served of each broadcast licensee, as of February 22, 2012, the Commission shall use, quote, the methodology described in OAT Bulletin 69, close quote. So that makes clear that the February 12th, February the 12th? February 22, 2012 date tells you the date as of which the coverage area and the population served are going to be calculated. But it doesn't tell you that the OAT Bulletin 69 that's going to be applied has to be the OAT Bulletin 69 that was in existence as of that date. Well, you read very quickly, and your alternative statute is, I think, even longer than the actual statute. It is. It is. And so what I think gets left on the cutting board, and I think this is a useful question to simplify what's wrong with the Commission's analysis, is that the way that the Commission reads the statute, this statute could be 20 words instead of 45. I mean, you know, the Commission has read the statute to say the Commission shall use reasonable efforts to preserve populated areas to the extent it believes it's reasonable and consistent with other goals under the Act. And as I heard your alternative statute, I was struck that the things that are missing are the same things that the Commission takes out of the statute, which is as of a particular date, you have to be able to determine something. Well, it's still determining it as of that date. It's just the thing that's being determined is coverage area and population served as of that date. But then you're applying OET Bulletin 69 not in the way that OET Bulletin 69 would have been applied on that date. You're just applying OET Bulletin 69 more generally. Sure, but let's then focus on what the point would be of specifying any methodology. It's not as if, you know, there was a raging debate in Congress as to whether it was Longley-Rice or some other model that was, you know, favored by the, you know, Republican minority. This was a technical rule that was already existing in a bulletin that was used for a specific purpose. And I think I really need to emphasize that, you know, the methodology as the Commission sees it is an empty vessel. You change all the data sources and you can change what the outcome is so that they have turned it, as the CTI ultimately admits, into the Longley-Rice model simpliciter. Now, the problem with that is that there is no point for Congress in specifying a methodology for the Commission's discretion to be restrained and leaving all of the aspects of the methodology that control the outcome that Congress specified up to the Commission's discretion. Well, then let me ask one question that maybe makes it a little more concrete, which is the debate about whether it's appropriate to use 2010 census data as opposed to 2000 census data. And as I understand your argument, because what the statute compels the Commission to do, you say, is to apply OET Bulletin 69 as it would have been applied on that date, you have to use 2000 census data. And I guess one way I would ask the question is this. The key statutory text for the purposes of this part is methodology described in OET Bulletin 69. OET Bulletin 69 existed in 1997. Existed when? Existed in 1997. So, in 1997, OET Bulletin 69 obviously couldn't use 2000 census data. There's nothing about the phrase methodology described in OET Bulletin 69 that itself compels the use of 2000 census data. Well, I think that that's right. But actually, that brings me to one of the key points as to why Congress's understanding of methodology had to be ours and not theirs. Because when the Commission had to do the transition to digital television in 2008-2009, by notice and common rulemaking, it upgraded the methodology to include the 2000 census. So, therefore, in a published ruling in 2009, which is at 73 Federal Register 5668, the Commission said, notice and common rulemaking, we will revise the OET interference analysis methodology to use the 2000 census data. So, that is unfortunate wording on the Commission's part. I'm sure that there's no doubt about that. But if you just bear with me for just one second, which is I take your point and I understand why you're making that response. But if you take that response out of the field of play just for a second and you just look at the statutory language, I guess my question is the quote methodology described in OET Bulletin 69, close quote, that doesn't tell you that you have to use any particular census. Well, I think that in the context, you know, the – I mean, we can go – it does not enhance VRBA, but it does cite to the regulation that incorporates the change that I just gave you, which is 47 CFR 73.616E1. The statute cites a regulation? No, no, no. The Bulletin cites the right. And so, I mean, you know, ultimately – Well, the Bulletin as of October 12th – I mean, as of February 22nd, 2012, but the Bulletin in 1997 obviously didn't cite that. Right. Okay. Well, I think it did. It's just that the regulation has been updated. I see. I see. Okay. But, you know, the point here, Your Honor, is that I do not want to fall into the game that the commission wants to play, which is I could come up with alternative dictionary definitions of methodology that involve the plugging of inputs and basically say that this textually and in the abstract could be any mathematical formula. There's no point in specifying that for two reasons. Number one, there was no debate as to whether that formula versus another one. And number two, because the Lonely Rise model by itself does not do what the statute says. It does not predict coverage area and population served. The only way it does that is with specific data sources, which, you know, the commission changed seven of them in this ruling. And methodology and data points are not the same thing. No, but they can be in ordinary language. In methodology, you apply methodology to various data points. Are you arguing that they could not use different data points because that would be a departure from the methodology? No, I think we have conceded that with respect to station-specific data points to identify what the interference is. And now about the population, the census population. Well, I mean, I would narrowly. That's a big encompassing data point. Sure, but, you know, if you step back to try to figure out what Congress was trying to do here, you could see how you might want to say. I don't like to step back and try to figure out what Congress was trying to do. I like to look at the statute, step forward and try to figure out what Congress did. Then let's go back to where I was before this current line of questions started. What the statute actually says is that you have to determine a certain thing as of a specific date. As of that date, there was only one way to determine it. No one actually is contesting that. And today, every use for which that method was used in 2012, that is to say, everything that existed in the real world for which the OAP69 unchanged was used by regulation, it is used today. So the net net in the real world is that the commission has changed in this rulemaking, you know, only the auction methodology that Congress went to treat it like everything else that was being treated in 2012. So the commission, if you file an application today, will use all of the data sources and the 2000 census that it claims here is outdated, just as it did in 2012. But it has changed the one thing that Congress wanted to be treated just as those things. Now, if I could give you sort of a simple example of why this matters now, and this is actually relevant to why the census point is actually something that's quite important. Take, if I have a TV station that covers Loudoun County. And so there's no dispute that in 2012, I covered whoever lived in Loudoun County. Now, the commission will say, in the repacking, we are going to give you the contour of Loudoun County. We're going to flood 40% of it with wireless interference. So you will have 60% of the actually usable non-interference coverage area you used to have. But you're a winner because the population of Loudoun County, more than the rest of the country, doubled between 2000 and 2012. And so you actually have an increase in population served. So what this rulemaking does is to take the contour, empty a good part of it for the wireless companies, and then tell me that I have won because in a victory of demography, the population of the country grew over the last 10 years. Now, that happened on average over the country, 9.7%. And what the commission is saying, that rather than using the tools that existed and were available to Congress in 2012, is going to come up with different tools to do something else different here. But why would – I don't know that that example necessarily – I'm not sure which way that cuts. Because if there, in fact, was dramatic population change in some service area, why would we think that what Congress wanted to do was to base the calculations on dramatically outdated population data? Because the way that the model works, the population served, or data, is actually a conclusion after you figure out what the non-interference area is. So the model actually tells you where the non-interference area is, and that's the coverage area. And then you use whatever census data you want to impute what the population served is. And so the commission has done that backwards. It's going to say, I'm going to give you a service area only where there currently are people. And if you want to build a subdivision in that part of Latham County, or if you want to have your beach house in that part if there were a beach, then you will have no television. And just as the wireless carriers would not accept that it would be no service while you're on the road just because you're not in your house, the same thing happens to the broadcasters because they, too, have mobile television where you can get on your iPad over the TV airwaves. Now, if I could go back to one point that I think is very important not to get misunderstood, the commission has basically read coverage area out of the statute. But I think its main rhetorical point in opposing what we're saying here is that we are not taking into account the logistic challenges of the auction. And I think that this is based on a textual misdirection. The methodology bears on what the commission has to do to preserve coverage area. The methodology is not for what it needs to do to repack. So that the game here is on how the commission is going to build the constraint files, how it's going to determine the meets and bounds of what we had in 2012 to determine what will be saved in the back end. So if you look at the order, there is a paragraph where they explain to you that before any of this comes up, I think it's 114, they have to build constraint files to identify what our meets and bounds are, what the coverage is, and what the population was. And our dispute is that to do that, you have to use OEP-69 as it existed in 2012. What you do after that with a different computer program for the repacking, whether you want to do an abacus or a supercomputer, it's actually not addressed by the statute. This deals only with how you go about identifying what it is that the broadcasters had in 2012, and what is it that is encompassed by your duty to preserve. Now the commission's alternative tactic is we have to exercise all reasonable efforts. And all reasonable efforts means that we have to take into account the larger objectives of the act. That again is textually misdirected. The reasonable efforts are directed to the goal of preservation, not to the goal of the acquisition of spectrum. And the commission actually gives the game up at paragraph 125, and I want you to listen very carefully to what they say because it's basically an admission that they will not be compliant with the statute. It said, efforts that would preserve coverage area and population served, but would prevent us from repurposing spectrum, would not be reasonable in the larger context of the Spectrum Act. And so in a statute that says that the reasonable efforts have to be directed to the goal of preservation, they are saying that the reasonable efforts, rather than being a textual limit on their discretion, is reasonable efforts to achieve as much spectrum as they can. That's not a tenable reading of the statute. It's not a logical reading of the reasonable efforts clause. And it turns what it is, by all lights, a restriction on the commission's discretion, and we can argue whether it is a high bar or a low bar, but it is a restriction on the commission's authority. It turns that into an essential grant of additional authority to come up with spectrum. And if you think about, with apologies to Jefferson Tell, if you think about the holistic reading of the statute that the commission endorses, it is imperative that one recognizes that the voluntary nature of the auction was essential to what Congress was trying to do here. And it is essential to that voluntary nature of the auction that you know before you bid what it is that you will have on the back end, what it is that you're putting on the table. And what the commission is doing here is to update everything in the methodology, as Congress understood it, to try to get more spectrum out of the act under the guise of complying with a reasonable efforts clause that is intended textually to preserve to the extent possible our rights as they existed in 2012. Now, I just want to say one final word on that, and just so that it is clear that in our view what the reasonable efforts clause means is not that the commission has to do impossible efforts, but it has to undertake efforts, probably high in our view, to the right goal, which is preservation, not freeing up spectrum. If I could just say one word about the APA problem, because I think it's as significant as the commission's failure to read the statute, I don't think there's any dispute whatsoever that the notice of rulemaking came, and there was not a hint, word, whisper, wink, anything indicating to the regulated community that the seven data sources that are, I think, in paragraph 125 would be radically changed to come up with an updated system. Whether you want to call it a methodology or not, and whether you think that there is discretion or not, if the commission had a statutory theory which came to full flower in the order, and it's a briefing here, but was not disclosed to the regulated community as to how this was going to get done, and it wanted to seek input, that was the place to do it. What it actually did is that a subordinate bureau, OET, then issued a quote-unquote public notice after the initial comment period was closed, and then it engaged in an elaborate game of what this court has called hunt the peanut, by putting what it was doing in a listserv that was not compliant with any federal register, anything that this court has ever approved, and by then turning around in the order and saying, you guessed wrong. The switches were supposed to be in a different way, or you picked the wrong software, yada, yada. But all of that is a failure that is a two-level fundamental failure. No notice of anything in the actual notice of proposed rulemaking. And number two, the radio relay problem of just trying not to disclose what the full basis of the expertise was, that the commission is now trying to rely here to defend its judgment. And that, too, is an equally serious one. But the first one, under this court's ruling in Sprint, is sufficient in itself to set the action aside. It seems a little different than Sprint because, at the least here, I take your point that it was not the agency itself that issued the notice, but it was put in the federal register and it was advertised as a proposed rule. No, it was published in the federal register. I think Sprint faced two distinct problems. One of them was that there was no publication in the federal register. And the second one was that there was no proposed rulemaking because the entity doing the proposing could not propose rules. And that's identical here. This court did not say that you needed both. And obviously, if the notice comes in something that is not a notice of proposed rulemaking, then it doesn't comply with the APA. You know, the key point is that, you know, the agency went for a double whammy in that case, but just because they only did one of those things wrong here, it is equally wrong. But in any event, even if you could conceive of a scenario in which that sort of thing could work for some agencies, it would still be indefensible to engage in a system in which you update, you know, the software. That's your second point. No, yeah. And just to deal with what the commission says about that, all of the nuggets in this order are in the footnotes. Footnote 474 is one of my favorite ones. It says, you know, not to worry. We kept a change log that you can access in this website. And you can write in for the previous version's court if you want to exercise in 706 APA review. Now, since I'm sort of a gullible person, I figure, okay, I'll bite. You know, that wasn't available really during the rulemaking, but I'll proceed. So if you go into the website for the change log, it's like updating your iPhone, where you're looking for the explanation of why the app that you just updated you need to update again, and the explanation is bug fixes. Well, that's what the explanations are in this note. It's sort of like improve cache, bug fixes. This problem that used to happen no longer will happen. And it is completely uninformative in terms of what it is that you're trying to ascertain, how this new process works, even if you thought it was authorized. It was, again, hunt the peanut. Now, I know that Judge Henderson has been very generous with my time, and I do want to say something. I do have a question. She's a much nicer person than some of us. Just until that has not even occurred to me. I have a question. Going back to what you first said, which was, although this is called voluntary, it's far from voluntary. And that was a question I had, was what if these broadcasters don't want to get involved in this auction? What protection do they have? And so the final order does say in paragraph 117, to protect non-participating stations, the commission decided that the repacking feasibility checker, and I don't know who that is, but will ensure that every non-participating station can be assigned a television channel in its pre-auction band. Now, what do you say to that? Well, I think that they will pick a band. I think that is literally true, but in the context of the order, meaningless. Because as they go on to say in paragraph 166, rather than covering the area where people actually get service, they are covering only the contour and not protecting for what really matters to service, which is interference. And so if there are terrain features, for example, that impede your getting TV signal in your farmhouse, the commission currently has a fill-in translator that will take the signal and take it to you. They're getting rid of that. If they're moving to the band in a way that the terrain will affect the signal differently, they're not taking into account that. And so, yes, they are assigning you a channel that will do something for you. It is not our claim here that they're engaged in complete expropriation of what we had in 2012. But it is our claim that in a statute that conjunctively says you have to give the area and the population service, which really speaks to whether you can get service without interference, whether the commission really has executed that duty, or whether it really has engaged in a confusion of statutory purposes. One of the things that the commission does quite effectively here is to always come into the court and say radio waves, gamma rays, it's all very complicated. Don't worry about it. Death hurts. But we're not in the area of, oh, my God, this is so complicated that my head hurts. This is in the area of what is the goal? It is to preserve. What was the methodology? Just one second. It would be part of your claim that the commission acted unreasonably in doing away with the translators. Is that correct? Correct. And also with respect to the question of terrain laws. But this is why I thought it was worthwhile to start with an example, because really what the commission is doing is saying we'll give you the same contour, and we will give you some of the area to the extent it's populated, even though the statute says covered area and population conjunctively. And then people that you used to reach with translators that we gave you in the digital transition, for the express purpose of allowing you to continue to reach the people you were reaching, those will be taken away, and we'll think about it later, see if we can do something. So they're not part of the same license as I understand it. They have a separate license? They are separately licensed, but they do have the same FCC-issued station identifier, and it's the same whole letters. Yeah, I'm not saying there's no association. There is an association, but the – No, but this is – you know, the reason why it's useful to think about the coverage area is because there are different types of translators. Those that you put inside the area to cover the terrain and the contour are the ones that we're talking about. If you want to put one outside the area to reach people outside your area, those are sometimes allowed, but we're not arguing about those here. We're really arguing about those things that the commission itself recognized in the DTV transition were essential to allow you to reach the population you were serving. So let me ask the question this way. The statute speaks in terms of protecting the coverage area and population served of each broadcast television licensee. So if you're talking about a particular broadcast television licensee and you're asking what's their coverage area, does that coverage area include whatever coverage is enabled by the fill-in translator? Yes, yes. By definition it does that? Yes, because as I said earlier, you know, the way you do this basically is you figure out what the interference-free area is, and then you use the census to figure out who lives there. And if these are pieces of equipment, as they are, that are essential to allow me to continue reaching the people who live in my coverage area and who we are reaching today, there is no non-arbitrary reason for the commission other than what it actually said, which is it would impede freeing up more spectrum, which, again, is a confusion of goals. Can I ask you a question about that? I'm sorry to belabor this point. But on the question of goals, of course the statute speaks in terms of making reasonable efforts to preserve coverage area and population served. That's what the text says. I'm sorry, Your Honor. Of course the statute speaks in terms of preserving coverage area and population served or at least making reasonable efforts to that end. That's what the statute says. But you don't take issue. All reasonable efforts. Yes. I didn't mean to leave out all reasonable efforts. But you don't take issue with the notion that there's also an overarching objective of making spectrum available. Well, I think that the larger point of the statute is to try to make spectrum available on a voluntary basis. And in order to ensure that this is voluntary, those people who are being asked to bid are being assured that the commission will exercise actual efforts to make sure, not to hold them harmless, but to make sure that they have the meets and bounds that they had in 2012 and they serve the same population. And so the issue that we're talking about here is B2. Although there is a larger goal of the statute, this B2 section is a specific restriction in the discretion of the commission on how to accomplish it. And the restriction speaks to a single goal, which is preservation of population served and collaborative area. And although the commission could take the all reasonable efforts clause to say, I don't need to engage in Herculean efforts, I don't need to expect to spend a trillion dollars doing this for very little incremental gain. It is not allowed to say, I don't like the goal that Congress gave me to save the broadcasters, and I'm going to substitute it for the one I like better, which is give spectrum to the wireless. And that's the fundamental problem at the core of this case. Thank you. All right. Mr. Hayne. May it please the Court. My name is John Hayne, Counselor for Petitioner Sinclair Broadcast Group. Sinclair is the largest broadcaster in the United States, owning and operating 162 television stations in the great majority of states in the country. With the Court's indulgence, I'd like to reserve one minute for rebuttal. Do you have a television station in Montana? Do you know? I believe Sinclair does, Your Honor, but I don't know for certain. What is your vision of what's going to happen to that television station? Well, let's just take for granted that Montana is remote and unpopulated. In remote and unpopulated areas, the FCC still intends to recover and reclaim spectrum. It may not need to purchase as many television stations in those areas, and certainly it depends on how close it is to the Canadian border, because that has an impact on the FCC's ability to repack because of constraints across the border. Right. We can anticipate that in Montana, the FCC will need to recover fewer television stations than it will in New York or Los Angeles or Detroit. So is it possible that in the more remote areas like Montana, the people who have UHF TV stations will continue to receive them? Your Honor, I would say that the... In other words, you just won't bid. Right. The more remote the area, the less difficulty the FCC has in reclaiming the spectrum it wants to reclaim so that it can repack. Okay. Before I begin my argument, I'd like to clarify one point. The fill-in translators that Mr. Estrada was speaking to are licensed under the same license as the main television station. They are part of the same license. So what we're talking about is fill-in translators. If you have a translator outside of the country who serves a different population, that would be a separate license. That's right, Your Honor. Those are not protected under the Act. Right. So the Spectrum Act allows the FCC to repack broadcast stations, but it's subject to two very specific limitations on that authority. First, it can only repack following a valid reverse incentive auction. And second, when it repacks, it must use all reasonable efforts to preserve broadcast service. This case is about the FCC's attempt to skip over those two requirements of the Act in order to recover more spectrum than it would otherwise be able to recover and also to rush the repacking process to the point at which it will knock some television stations off the air altogether for an indeterminate period of time. I want to start first with the 39-month hard deadline that the FCC adopted. The FCC determined, in spite of the fact that Congress gave the FCC 10 years to conduct the incentive auction, the FCC determined that it wanted to conduct the auction as quickly as possible and recover the broadcast spectrum as quickly as possible. And in doing so, it set a 39-month deadline by which all television stations after the auction must cease operations on their pre-auction band, regardless of whether they've been able to build a new station, even if that's beyond their control, even if the reason is because the FCC gave a permit in the forward auction following the reverse auction that they just can't build out. So if we're not in a repack situation, but we're in a situation in which we're just talking about new construction, what's the time frame within which the new construction is required to be made? The new construction time frame under the rules is 36 months. There has never been a situation before in which potentially a thousand or more television stations had to be constructed in a 36-month period. In fact, the real process is that, and this is in the record, and one of the antenna manufacturers said, once we get an order, it can take us a minimum of nine months to build an antenna. This is hand labor. This is not assembly line work, right? This is very skilled labor, and it's very, very custom equipment. And we also have a very contracted industry. After the digital transition, the supply industry contracted. And then two years ago, the FCC imposed a freeze on all broadcast television station applications in order to fix everything for the auction, to stop everything. The result of that is these supply industries have, many of them have gone out of business, many of the suppliers, the others are down to skeletal workforces. They've had no business for two years. And now the FCC is saying, in spite of all of the industry suppliers that have to make this transition happen, the FCC has said, we think they'll step up to the plate and make this happen. It shoves into a footnote, the FCC does, into two footnotes, a long string site of commenters from these supply industries that says, there's no way that this can happen in 39 months. We submit that this is Sorenson Communication versus FCC all over again, and that the FCC's predictive judgment is not entitled to any deference because it's absolutely unsupported anywhere in the record, and, in fact, it's contradicted entirely by the record. There's another aspect that's troubling here, and that the FCC is skipping over the two competing licensees requirement in order to reclaim more stations than it could otherwise reclaim. That compounds the repacking problem, because it leads to more repacking than the FCC would otherwise be able to accomplish, which compounds the problem of having all the work done within the 39-month period. The FCC, again, cannot repack without having a valid incentive auction on the front end, so the harm and excess repacking to Sinclair flows directly from the invalid incentive auction. I see that my time is up. I'd like to ask the Court to vacate the FCC's order in the respects that we've requested. All right. Thank you. May it please the Court. Jacob Lewis for the Federal Communications Commission. Let's go to the language of 1452B2, if we could. Under that section, the Commission is to use the methodology described in the OET Bulletin 69, not everything mentioned in the Bulletin. What is encompassed within the term methodology in the Commission's view? Well, broadly stated— You're not going to tell me what it is, but I want to know what it is. I understand, Your Honor. Broadly stated, the methodology in OET Bulletin 69 consists of basically three parts. First, you identify the signal contour. That is the area that a particular specified broadcast signal of a particular strength covers. Then basically, for want of a better word, you chop that up into a grid, into a number of cells. And then you use the Longley-Rice propagation model to evaluate whether or not you actually get a viewable signal in those cells. That's a much simplified version of what the Commission stated in footnote 435 of the order. That footnote is written in somewhat of engineer speak, as is OET Bulletin— It might have been nice if the Commission had put more things in the opinion and fewer things in the margin of the opinion. Well, the issue here, Your Honor, is— Our colleague, former colleague, Governor McGee, used to say if God meant for us to put the law in footnotes, He would put our eyes on the vertical fundus and the horizontal. Well, I think maybe perhaps with that footnote, putting it in text would just accentuate the eyes glazing over with the engineer speak. So there may have been a reason to put that particular description in the footnote. But the issue here is what the methodology is not. So the methodology— No, the issue is what it is. Well, both. The course of the argument may involve what it's not, but the Commission has to tell us they have to justify what they're doing. They have to show us they've complied with the statute. You can't do it for them. I understand that. And I'm not sure that I find a good place that tells me what the Commission thinks methodology is set for. Well, I think that description is in detail in footnote 435, but in general, as I described it, it is those three steps. The issue here—look, methodology is a process for analyzing a problem. Methodology is not data. Data is what methodology acts upon. Methodology is not software. Software implements a methodology. And the argument here that somehow software and data were included in the phrase methodology described in OET69 just simply doesn't comport with the language. If Congress had wanted the Commission to use every word in OET Bulletin 69, then presumably it would have said something far less indirect than methodology described in OET Bulletin 69. The use of the word methodology was a careful choice by Congress, and it recognized that the Commission necessarily needed to make a lot of judgment calls in this incredibly complex auction. The same is true— It's a very odd word choice by Congress. I don't remember a parallel to this. As a Commission, do you not get to face anything like this before? Well, it is unusual for Congress to pull up a particular bulletin and identify it, but it is also— what it was talking about was the methodology described in that bulletin, and the petitioner's argument is no, we would have to use everything, every last statement in there. Outside of what it says in, I think it's written on 434, is there anything in the body of the opinion that says what the Commission construed methodology to mean in the context of this case? I think most of the order is concerned with the objections to the Commission's choice to update the software and the data so that most of the order is concerned with the Commission's— You didn't even answer to my question. Well, what I was trying to say, if the answer is no, there isn't a fuller description of what the methodology is. There is quite a complete description of what the methodology is, not insofar as it— If we're going to oppose what the Commission does, don't we have to be able to look to their opinion to determine if they've stated their rationale for what they mean? Yes, Your Honor. I think, albeit it's in footnote 435, I think that is a more complete and detailed description of what the methodology described in OET 69 is. But I do think for purposes of your opinion, you only have to conclude that data and software are not methodology, and I think that's a fairly straightforward question. There is another part— That's in the text of paragraph 134. Yes. I want to go just a little farther to that. On part of 435 that follows the two parentheticals, it refers to an algorithm for evaluating the availability. Would not the very classification of a particular bulletin and send the methodology there suggest rather than an algorithm, it has to be the algorithm that was used in the bulletin? Well, I think that was just describing—I think that algorithm is—they could have used the word the algorithm. There was only one algorithm— The algorithm sounds like part of the methodology. That is what I'm suggesting. So by Congress, by using the unusual mandate to follow the methodology from that OET bulletin, could be thought to be mandating the algorithm employed by—in that— Well, I think that algorithm they're referring to is the propagation model, the Longway-Rice propagation model. It does not suggest— That's a good answer. Okay. Well, then I'll stop with that part of the answer. The other part of section 1452b2 that I'd like to call the Court's attention to is that it asks the commission, requires the commission use all reasonable efforts to preserve coverage area and population. Not every conceivable effort. And the use of the word reasonable, which is a frequently used term, is a term that Congress uses to give an agency broad discretion. The commission's task here was to preserve coverage area and population, sir, but only to use all reasonable efforts. And the use of that language recognized that this is cases not—and the Spectrum Auction is not all about the broadcasters. The Spectrum Auction was—gave the commission authority to conduct a workable incentive auction to repurpose Spectrum from those broadcasters that voluntarily decided to relinquish it, to repurpose that Spectrum for—to clear that Spectrum and repurpose it for more flexible uses. The last part of the section 1452b2 that I'd like to call the Court's attention to is the as of February 22, 2012 language. What's to be preserved here is coverage area and population served as of that date. And the commission's interpretation was as it existed on that date, not as it could have been calculated on that date. And at the minimum, that's a reasonable interpretation of what I think is not particularly ambiguous, but even assuming it was ambiguous language. The as of February 22, 2012 modifies coverage area and population served. It doesn't modify the methodology. So the fact is the commission's task is to figure out what the population served in the coverage area was as of February 22, 2012 as it actually existed. And obviously, one way to do that is to update your census data from the year 2000 to year 2010. It's inconceivable to me that Congress would have wanted in a statute that is concerned with the state of the world in February 22, 2012 that it would have compelled the commission to keep the 2000 census data in the methodology. So I think petitioners are making two layers of arguments. One is that what you just addressed, which is that the coverage area and population served is not only what's being modified by February 22, 2012, that the statute either explicitly does or should be read necessarily to say that you have to apply the OET bulletin 69 as it was in existence on February 22, 2012. But then there's another part of the argument, which is that regardless of that, you have to make all reasonable efforts to preserve both coverage area and population served, and what you're doing is one to the exclusion of the other. Well, that's an argument outside of the methodology. So if we would turn to that argument, that doesn't really depend on the interpretation of the term methodology. So there is an argument that with regard to unpopulated areas, that the commission has, in petitioners' view, violated its obligation to preserve coverage area. So it's a little counterintuitive here. We're talking about unpopulated areas, but the objection is the commission didn't do enough to preserve coverage area. What the commission did to preserve coverage area was to replicate the signal contour of the station on its new channel. So the stations that are not relinquishing their spectrum will have to be placed somewhere. This is repacking we're talking about. And in repacking, the commission made clear that what it would do is take the station's signal contour that it had on its old channel, and then it would replicate that on a new channel. I understand from the engineers that when you move the station from one channel to another, so in this case, say, from channel 50 down to channel 35, the signal will travel differently. It will propagate differently. It will cover a different area. That was an important part of the commission's decision to say, look, we won't leave you with where you would be on channel 35 absent any change on your part. We're going to bring you back up to the signal contour that you would have had on your old channel. The commission's determination was replicating that contour and the area within it, preserved coverage area. Now, the specific objection broadcasters have, and this is technical, but is when the commission decides to repack, it has another constraint. It takes account of interference only with regard to populated areas. So essentially, if you imagine these things as, I know I'm going to get criticism from the engineers out there, but as bubbles or, you know, balloons, and you're trying to put them, pack them together, if you have, if you find that in placing a station on a particular channel, that there is interference, but the interference is only over an unpopulated area, the commission will still repack the station in that channel. Why? Because the only interference is in a place where nobody lives. And that is a separate question from preserving the coverage area. They preserved the coverage area. But how is not the upshot of that, then, that it morphs coverage area and population served? I'm sorry? How is the upshot of that seems like it then morphs coverage area and population served? No, because the commission's done something already independently, which is to replicate that front. So one of the things the commission said... But to what end? I mean, you can have a first... To what end? Because you could have a... It sounds like what you're saying is there's a first step that involves drawing a map that covers contiguously the same border that was covered before, and then there's a second step, and at that second step, we don't care about the areas within that contiguous border that are unpopulated. Well, that's not precisely true. So only where there's... So imagine that you have... Let's look at this. Imagine a circle, and there's an unpopulated area over to the left, and there's an unpopulated area over to the right. And when you repack it, the unpopulated area over to the right has interference that the commission ignores. The unpopulated area over to the left continues to receive the signal because the commission preserved the contour. So it is not correct to say that unpopulated areas aren't protected. They are protected. They're not protected in the repacking, but that's a different question than whether there's a signal. So in replicating the signal, the signal will go over populated areas and unpopulated areas. This only is what does the commission have to do in light of its all reasonable efforts obligation when it's deciding to repack. Does it have to protect unpopulated areas? If it finds a situation where it can otherwise place a station in there, in compliance with all of its other constraints, and it will fit, but there's more than the normal interference over an unpopulated area. The other commission said, look, that would be an undue constraint on repacking. It would take options out from our toolkit in repacking, and it's not reasonable for us to do that here because these are, again, unpopulated areas. So the commission could clearly take into account that the area is unpopulated when it's deciding what to do with the repack. So that's what that issue is. I'm sorry. Can I ask you a question about a different topic, which is the fill-in translators? I was under the impression that they operate under a separate license. Yes. But it sounds like that's not the case. No, they operate under a separate license. I think the idea is because they're fill-in translators and they were associated with a station. They're not supposed to be used by some other station. They're associated in the files of the main station. You can tell which station, which main station is using the fill-in translator, but they're separately licensed. Our argument on fill-in translators is that fill-in translators are separately licensed. Yes. I thought we heard the opposite from that point. No, I think what you heard, well, I'll let Mr. Estrada explain his statement. It wasn't Mr. Estrada. I think it was Counsel for Sinclair. They do look a lot alike. My understanding is if you want to get a fill-in translator authority, you have to file a form and get a separate certification for that. It's then associated in the file with who has it, and it may very well have the same call letters or whatnot. But the problem with fill-in translators, there's a practical problem and there's also a legal problem. Let's start with the legal problem. The statute defines what a broadcast television licensee is, and Congress was very careful to say it's a full-power television station or a low-power television station that's been accorded primary status. So it does, and I get your textual argument on licensee, but it also talks about making all reasonable efforts to protect coverage area. And if the coverage area of a broadcast licensee includes the coverage area of a fill-in translator, then the fact that the fill-in translator may be operating under a separate license or may not be a broadcast licensee starts not to matter as much because you're still talking about the methods by which you preserve the coverage area of the licensee that we care about. I would say that the coverage area of a fill-in translator is the coverage area of the fill-in translator, not the main station. So that's the question. When you figure the coverage area of the main station, does it include the coverage area that's made possible by the work of the fill-in translator? No. Because the statute describes, and there's another statute provision that I can just call the Court's attention to, but there's 1452b-5, which talks about low-power television station usage rights and says that nothing in the subsection will be construed to alter the spectrum usage rights of low-power television stations. By the way, fill-in translators and translator stations are low-power television stations. They have always been secondary insofar as interference is concerned. There's no dispute that a fill-in translator always had to take interference and could not cause interference to another full-power station. So if I'm just asking the question, what's the coverage area of Broadcast License C-1, you're telling me the answer to that question doesn't depend on the coverage supplied by an associated fill-in translator for Broadcast License C-1? Yes. And I think that's a natural outcome of the Commission's decision, which had made quite clearly that fill-in translators would be protected, that their coverage area wouldn't be preserved. Now, another thing, there are a couple of practical questions on fill-in translators, if you'll indulge me. First of all, fill-in translators were to deal with a problem in the digital transition. There may be a terrain loss or coverage problems that arise from the incentive auction, but they're different. So there's no particular reason to keep, even though the Commission acknowledged that there's a good purpose to have some kind of replacement translator, and it instituted a proceeding here after the repacking to decide where the problem might lie and to establish licensing for new digital-to-digital replacement translators. There's no particular reason to keep the old digital replacement translators because they'll be new. If there are propagation difficulties, they will be newly arisen from the incentive auction. So I think that's a practical aspect, but our argument rests on Congress's decision to specify, which it did quite clearly, whose stations' coverage area and population should be preserved. I see my red light is on, so unless the Court has further questions. Thank you. Mr. Perrella? May it please the Court, Dominic Perrella, on behalf of CCA and arguing for the consolidated interveners. Let me begin with the language of Section 1452B. The petitioners say in their reply brief at pages 8 and 9, the Spectrum Act refers not merely to a methodology but to the outputs of that methodology, namely, quote, the coverage area and population served of each broadcast licensee, unquote, as they were calculated on February 22, 2012. I want to draw the Court's attention to the fact that those last words of that sentence are nowhere in the statute. What they've done is take a modifier that is at the beginning of the sentence, which they purport to quote, and move it to the end. As a matter of fact, if you look at the sentence in question, it's clear, as the Commission has said, that the as of February 22, 2012 language modifies population served and coverage area. And when you're thinking about how do you preserve population served and coverage area as of February 2012, it makes perfect sense that you do so using the latest data that you have available. You don't use outdated data and you don't use inaccurate data. And yet that's the import of the petitioner's argument. I'd like to briefly mention an argument petitioners raise in their reply. They point to several statutes that actually use the term Longley-Rice. And they say, look, if Congress wanted the FCC to use Longley-Rice. Before you go, before you skip forward, let me just go back for a second and maybe I don't know that you're in a position to answer it, but we've heard that if you actually did the work now and you ask what's the coverage area and population served and using OET69, that 2010 census data would not be used, that it would still be based on 2000 census data. It's only when you implement the Spectrum Act and apply this statute at the time of the auctions done that you would go to 2010 census data. Sure. Petitioners say that in their reply brief. I guess I would make two points about that. The first one is that, of course, it's black-letter law that an agency can act incrementally. So they've implemented this new system. It may well be that the next time someone attempts to set up a coverage area of a new station that they decide to update the methodology with respect to that application as well. But I would also point out, actually, that the citations that petitioners offer for that proposition in their reply brief and if you give me a moment, they cite JA1312 and 1333. Neither of those pages actually stand for the proposition that the FCC is still using the old methodology. Page 1312 is an unsighted assertion by NAB to that effect in a comment letter, and page 1333 doesn't say a word about the topic. And so I think that that's not established in any event. So you don't, I mean, I guess you're not commission counsel, so you don't necessarily know one way or the other. But as a practical matter, do we know whether? As a practical matter, I do not know. But I think the bottom line answer is that the incremental doctrine, incrementality of action doctrine, really covers the question. But coming back to the Longley-Rice statute, they say, look, if Congress had, this is just what the interveners in FCC are saying, is that OE-669 is just the Longley-Rice methodology. And if that's what Congress meant, they would have used the words they use in these other statutes. But the fact of the matter is, the methodology of OE-669 is not just the Longley-Rice model. As the commission pointed out, it's first stage, you draw the contour using a method that is, in fact, referenced by CFR code in OE-669. Second stage, you draw the grid. Third stage, you apply the Longley-Rice model. And so Congress could not have simply used the words Longley-Rice. That would have been a different statute. A couple other points with my limited time. Number one, Petitioner's Council offered the example of Loudoun County and said, hey, you know, the Loudoun County grew exponentially between 2000 and 2010. So when they say they're protecting population served, they're not really. It's just that the county grew. I think that that is demonstrably incorrect. Because what the commission is going to do is take the 2010 census data, plug that into the model, and use that to determine the population baseline. And then they're going to replicate that population baseline when they reassign the stations. With respect to coverage area and whether that's been read out of the statute, Judge Shinibasa and I just wanted to return to that momentarily. Let's go ahead and come at it from a different direction than Commission Council. When the commission is preserving population served, they are preserving areas that are already populated and making sure there's no interference in those areas. But if that's all they were doing, they could draw the contour in such a way that it actually excludes those areas so the signal would not even reach them. By making sure the signal propagates to the entire circle, to oversimplify a little bit, they are, in fact, protecting coverage area. And so the idea that coverage area has been read out of the statute is not correct. Finally, with respect to translators, Commission Council has already explained why the statute is to the contrary. I wanted to also mention that the NAB in their papers below actually took the opposite position of the position they're taking now. This is a joint appendix, 1232 and 33. They agreed with the interpretation the FCC advances. They said, quote, Congress did not protect translators in the same manner as full power and Class A stations, unquote, and that, quote, as a natural consequence of the auction as authorized by the Spectrum Act, a significant number of the television translator stations will be forced to go off the air, unquote. And last but not least, let me mention just more generally that there are a number of assertions in petitioner's reply brief that are based on facts that the FCC rejected. They assert that the FCC can run the auction using the old software. The FCC rejected that at joint appendix page 62. They rejected the facts specifically that NAB had submitted. And petitioners say that FCC forfeited that argument by not raising it. They say that in their reply. But the case they cite, Verizon v. FCC, is about a situation in which the FCC simply had said nothing about an argument and no intervener had been an issue. There was an intervener in the case, but they're not mentioned in that discussion. Here, of course, interveners have raised the issue. And the fact of the matter is we're talking about a rejected factual assertion that interveners are still relying on. I don't think waiver principles apply in the same way. I know your red light is on, though. I do. And you're going in an awful lot of detail for a person whose red light is on on things that you could have said earlier. Judge Henderson, may I? Why don't you wrap it up? I'm sorry? Why don't you wrap it up? Okay. Last comment. Let me just say this. At risk of drawing a question from Judge Sentelle, let me say that petitioners have emphasized, of course. You can only end. I promise not to. Petitioners have emphasized that one of the purposes of the Spectrum Act is to protect broadcasters and to make the auction voluntary. I made that promise based on the humanity. I'm going to end in 10 seconds. First of all, broadcasters will know before the auction what they're giving up because the FCC has told OAT to publish their contours before the auction. And second of all, the overarching purpose of the statute is to repurpose Spectrum. That's important to the American economy and to wireless competition. Thank you. Okay. Nobody has any time left. I know that. Mr. Estrada, why don't you take three minutes? Thank you, Your Honor. Let me just see if I can do this quickly so as not to infer the rate of Judge Sentelle and not have him compare me to Mr. Hain. The issue, as Judge Sentelle pointed out, is what the commission's view of methodology is because the commission cannot come here and claim deference if it hasn't proffered any estimate of the range of ambiguity in the term and doesn't know what it means and is merely going by what it's not. On the point of whether it is right on whether it can go by its view on the order and the notion that this all boils down to picking a grid and applying a lonely rise, the commission's view of methodology is the same as if I told you I want a roast chicken baked under the Julia Child recipe, and the commission would say, well, that involves applying heat to meat, and therefore I'm going to give you fried lamb. If you look at the bulletin itself, OET, in terms of what the methodology is, it expressly refers to the computer program, and it tells you at page 501 and 502 of the joint appendix to go to the media bureau version of it so that the commission, in claiming in its order, oh, there are many versions. This is so confusing. It's actually no reading OET itself. It sends you to the media bureau. If you look at the first page of the bulletin and at the commission's order itself, one of the things that it sends you to is a 1982 monograph by Lumley herself. If you open the first page of that monograph, she tells you that this lonely rise model is basically like Maxwell's equations. It's a way of describing most aspects of physical reality. And if you take that to be what the commission calls a methodology, you know, it would be pointless to the point of surplusage to identify it as a methodology in the statute. On the question of census data, I agree with the point that has been made, and I would not ordinarily take the view that it is necessarily part of the methodology in the statute. If before Congress passed the statute, the commission had not in multiple orders told Congress that it considered the census part of the methodology. But at the end of the day, you know, the key question is whether Congress was trying to price predictability over absolute precision. And what's important here at the end of the day, as I said earlier, is the coverage area. If you identify what that is, you impute the population, whoever it lives to that area. And what the commission has done is try to cut down on the coverage area. One final point on what counsel just said on the rejected facts. These are all of the facts that the commission came up with on theories of the statute and of the reality that it never noticed. And so the commission can come into this court and say, I found the opposite when it never put the subject on the table for discussion. Thank you so much. All right. Mr. Hayne, why don't you take a couple minutes? Thank you, Your Honor. Judge Henderson, I'd like to return to the question that you asked because I'm not sure I really answered it the first time around. Your question, I believe, was what happens to a station in Montana if the FCC doesn't need spectrum there? The answer is stations all over the country, regardless of whether the FCC needs to actually have volunteers participate in the auction in that area, are subject to repacking. So the FCC is going to start at Channel 51 and go down to Channel 37 or perhaps down to Channel 26. But they'll still be in this pre-auction band, according to the final order. Well, what they mean by pre-auction band is UHF to UHF. So the idea is that if you're in Channel 48, you're going to be repacked whether the FCC really needs volunteers in that area or not. And that's our point about the two competing bidders. To the extent the FCC goes into these single bidder markets and buys more spectrum, it increases the clearing target. So it makes the auction much bigger than it would be if it complied with the strictures of the Act. And the FCC says in paragraph 415 that's expressly why it's ignoring the two competing bidder requirement, because it wants to reclaim more spectrum. The impact of that is to force more stations to be repacked, even where the FCC does not need spectrum. That places more disruption and more cost on Sinclair and other broadcasters, which is the basis of our complaint. All right. Thank you. Thank you, Your Honor.
judges: Henderson, Srinivasan, Sentelle